Our third case for this morning is Dixon v. Cook County. Mr. Robertson. Good morning, Your Honors. Kevin, I see the theme for the day that you guys have here. You moved from asthma to metastatic lung cancer, right? Exactly. Kevin Dixon, in this case, entered the Cook County Department of Corrections in October of 2008, became ill, started to have pain, and was, in mid-December of 2008, had a CAT scan which showed large mass in his lung. No dispute to these facts. That's the December 10 chest x-ray? Yes. No dispute to those. He sees a pulmonologist on 12-23, and then on 12-30, he becomes ill in his cell. He can't walk. He's laying in his waist. A call is placed by the guards. Nurse doesn't come. Nurse just says, hey, three-day sick call, meaning in three days we'll see you. That night, the guards try again. At that point in time, he's brought to the hospital where he reports he can't walk, he's in 10 out of 10 pain, and that night, through the course of the next day, he's defecating on himself multiple times. He sees Dr. Bonaparte. Now, this is still in the jail where he sees Dr. Bonaparte? All the claims in this case involve Dr. Bonaparte in the jail or the Mell case against Cook County or the nurse against Cook County. So it's not over at the CIRMAC facility? Well, CIRMAC is the hospital within the jail. In Division 10? No. Division 10 is an entirely separate entity. Okay, so CIRMAC is the health center in the jail? Yes. And that's where Dr. Bonaparte practices? Yes. And Dr. Bonaparte sees Kevin Dixon, examines him. This is the 31st of December we're up to now? Yes. And that's the only time she sees him, according to at least one element in the record. He's kept there until January 2nd, where he has another scan. The scan on January 2nd shows it's spread to both lungs. It's pressing on his spine. Regardless of that, he's discharged into Division 10. Now, I said it was general jail population. The defense says we were not being truthful about that and says, oh, no, it's a medical tier. And citing to a website, which shows how much evidence there is in the record as to what Division 10 is. But I will say this. If it is a medical tier, that is the greatest proof of the county's problems in this case because there is not one single piece of paper that explains what happened to this man on a medical tier from January 2nd to January 5th, where he's brought back laying there, can't walk, 10 out of 10 pain, soiling all over himself with stage 2 pressure sores on his body, which do not just magically appear. And yet, we get middled here. Dr. Ponopart's out on the 12B6. Oh, she goes initially, you know, I didn't see the scans, you know, but I knew about the mass. But I discharged him. I discharged him into that Division 10 for a psych consult to rule out malingering when weeks before, he's already got the pain, the diagnosed tumor. But you have film evidence that there are these masses. I'm sorry? There's film evidence. There's x-ray and CTs about the masses by then. Yes, absolutely. There's no question about that. But she says... So why does she think it's a psych matter? Judge, one, I think that that's something that they should be able to address because our position is that there is no reasonable position at all as to why you should think that's a psych consult. And it was alleged in the amended complaint that she knew of the mid-December CT scan results showing the mass in the lung and the pulmonary consult later in the month, which generated another order for a follow-up CT scan. Yes. And so at a minimum, she knew that. Whether she did or didn't read the January 2nd CT scan or see the radiology report of it, she knew at least that much. I agree 100%, and thank you, Your Honor. And that was alleged in the amended complaint on which this case was dismissed against her. Yes. And I think that the knowledge of the mass in the lung, considering with the pain and the symptoms he was experiencing, in and of itself should not have let her out on a 12B6 for that. What is more additionally egregious is the send him off to this black hole Division 10 after it's in both lungs impinging on the spine, no question about it, where he winds up in the pressure source. She's the treating physician. She's the head, the supervisor of this acute care wing, and yet the district court let her out because these were just mere general allegations and there was no proof she had any control over this. Well, it's got to stop with someone. She's the doctor. She's the treating physician. She's the supervisor. If she can't get it done, then I don't know who can. Now, the allegations in the complaint or the amended complaint against the nurse were far more sparse. It was just that the nurse was notified that he was complaining of pain, couldn't use the bathroom, and couldn't get up. Exactly. That's all that's alleged against the nurse, and he was moved from his cell to the health unit that same day. I agree on all those. If you ask me who's got the stronger claim, obviously the claim is much stronger against Bonaparte. But with respect to the nurse, when you have someone who can't move and is explaining of pain, that's not like I'll see you in three days. Is it clear based on the complaint that the nurse set the sick call for three days later? I thought that came from the guard. Either way, it's in the record. But to determine whether the allegations are sufficient to go forward against the nurse, we need to know who set that sick call three days down the road as opposed to that same day. We know he was seen that same day. He was only seen that same day because the guards recalled it into the second shift, and a different nurse wound up responding. It wasn't the same nurse. The nurse who did it said three days later. It's my belief in the record that it's the nurse that set that. I don't think it's in the complaint verbatim, but it's that the nurse set the sick call, and I think the record subsequently developed that the sick call was three days later. I know it's a more general allegation, but when you have such a serious medical condition and then you say, you know what, we'll see you in three days. Right, but the nurse didn't have the knowledge that the doctor had, right? The doctor acquired that knowledge once he was admitted to the health facility. All the nurse knew was what was in this note from the guard, that he's in pain, that he can't get up. I would say this, Judge, and I'm going to use that to transition into my second point on the Minnell. The amount of knowledge that any caregiver has in the Cook County system is, during this period of time, I don't know what they've done since, was completely terrible. You would believe that, like any other medical facility, and Dr. Bonaparte winds up giving an affidavit after she's out that, oh, yeah, she saw all these scans because they're in this wonderful medical system. If you believe everything that they tell you is in the system, then any caregiver at Cook County, at CIRMAC, should have been just able to see every single medical record for every single inmate, and not only at that hospital but any of the county hospitals. So your allegation under Monell is that, let's just say, the electronic system hadn't been fully implemented, so there was a paper system and an electronic system? That's part of it. What it is is this dysfunctional record-keeping system, and that's just part of it. It leads to, basically, barriers to informed care. You have paper records and electronic records. And this is in this DOJ report and Greifinger's testimony? Yes, but also their own chief medical examiner, chief medical officer, Dr. Hart, testified under oath, comes in and says, oh, yeah, we're at the DOJ report, sure. Between the time of the DOJ report and when Mr. Dixon was treated, yeah, we didn't get a chance to change anything. So that's their own chief medical officer saying that, that the infirmities identified in the DOJ report were still present at the time Kevin Dixon was being treated. So if you look at this record-keeping system, electronic records, descriptions of weeks or months' backlog, and also the physician who finally admitted Mr. Dixon, Dr. Cruz, on the 5th, that he testified in his deposition that there were these problems with the record-keeping system. You also saw this manifest with the paper records wouldn't necessarily come with the patient. So you have no electronic records and paper records that you don't really see with the patient. Considering this, you're operating in a factual vacuum. Now, that factual vacuum was something, at that time, the county was put on notice of, yet the Department of Justice report lays it out. We go out, we get the guy who did the 17-month investigation into the DOJ report, a guy who for 17 months investigated the exact same failures at Cook County. He writes a report saying, you know what? I see these exact same things in the case of Kevin Dixon, the exact same impediments to care, and there were causation. They were the causation of it. And the district court, different judge presiding, were out on that too. Can I just ask again for clarification? Nobody's saying that Mr. Dixon would have had a different outcome if there had been care. This is basically about getting him palliative care sooner? 100%. The palliative care sooner, if you look at the Menel, you're looking at, like, the mid-December. When you get those indications of mass in the chest, and Dr. Cruz said that that should be done within 24 to 48 hours, and we see it already extended out. Oh, you see the pulmonologist in eight days. Two weeks later, they're still talking about sending him to a pulmonologist. That palliative care sooner. The claim against Dr. Bonaparte would necessarily be for that period of time, from when she discharges him, January 2nd, until when he appears with a pressure source, January 5th, where he gets sent to the black hole of Division 10. So it's a few days. Yes. I mean, not to say that you should keep somebody in pain for a few days, but it's not a long time. No, it's not. But considering his diagnosis, considering those were the last days of his life, he wound up passing about two months later, early March, I think. After he was hospitalized, did he return to the jail? I don't think he ever returned to the jail after January, and he was discharged from Stroger to his home for the last, I think, couple weeks of his life. Okay. That was a compassionate release, I believe. It was. And I know that the – oh, I see I've run into my rebuttal time. If you would like to save it, that's fine. I'd like to save it. The last thing I'll just say quickly, the standard, genuine issue of material fact, and 12B6, those standards should come in our favor 100%. We should have some opportunity to bring this case to a jury. Thank you. All right. Thank you, Mr. Robertson. Mr. Cargi. Good morning, Your Honors. Thomas Cargi, C-A-R-G-I-E, Assistant State Attorney on behalf of Drs. Bonaparte, nurse of Boyd v. Encoe County. Your Honor, this case is an admittedly strange procedural posture. I could not find any cases where individual defendants got out in a 12B6 motion and the county or Monell claimant, or defendant rather, got out in a summary judgment motion. And because of that, the plaintiffs in this case have used – plaintiff, rather, has used discovery as sort of a tool against Dr. Bonaparte and nurse of Boyd. Basically, they cherry-pick from the record, from the facts that were developed during discovery, to say Dr. Bonaparte clearly was deliberately indifferent to Mr. Dixon's needs. When, in fact, the example that they've been using, the Division 10 thing, Mr. Bonaparte – I'm sorry, when Dr. Bonaparte saw him on January 2nd, and they denied that Dr. Bonaparte saw him on January 2nd, but clearly she did because she filled out both a dormitory transfer form and a prescription. And in the dormitory transfer form, she said it was her practice to ask the complaint, the patient, about any complaints he may have had. On that form, she identified his claim paralysis, but she also noted that there was a question because nurses and other detainees had seen him walking. But, you know, I mean, you make a big deal out of that, and it seems to me there's plenty of factual room for everybody to be right and to understand this. He's – a jury could think that it's not normal to lie in your own waste, you know, and that you would be doing so only if maybe not cannot walk in the sense of a paraplegic, but very, very difficult and painful and so feel – you know, you might say colloquially you can't walk. I mean, that could happen. As far as the procedural point you're making, our court has looked at Reynolds. It's fine to support one's complaint by noting the kinds of facts that you would be prepared to prove that are consistent with the plausibly alleged complaint. I don't see any big issue there. I don't believe with that point, Your Honor. But to what you said, they are very reliant in this case on the imagery of Mr. Dixon sitting in his own waste. Well, and also the imagery, the literal imagery, the X-rays and the CTs showing that he's got gigantic masses in his lungs pressing back around the spinal cord. Well, Your Honor, that was – excuse me, but Dr. Bonaparte didn't see that CT scan. So isn't that inconsistent with your theory that all medical information was immediately available to everybody? Presumably it was on CERN, Your Honor. I don't know if it was on the electronic record-keeping system, but Dr. Bonaparte didn't look at it. Well, I mean, but she was aware of the earlier findings. Yes, she was, Your Honor. Right, and that's clearly in the amended complaint. Yes, Your Honor. Why doesn't that state a plausible claim for deliberate indifference? Because she's aware that there has been a CT that disclosed a large mass on his lungs and that he's been seen by a pulmonologist who ordered a follow-up. And she's treating it with Tylenol. Why isn't that enough to state a plausible claim? Well, first of all, there's no evidence in the record. Well, this is a 12B6. Yes, yes, you're correct. Okay, and those allegations, there's a lot of detailed allegations against the doctor, not very much against the nurse, but there's a lot of detail against the doctor about what she knew to state a plausible, subjective state of mind that pleads to the deliberate indifference standard. So it seems to me that claim, at a minimum, was prematurely dismissed. But she, the complaint alleges that he was in excruciating pain, but that's a conclusory statement. There's nothing I know. Well, it's not. We have many cases that discuss pain. And if somebody says they were in pain, it's based on personal, you know, or obviously he's dead, but, you know, that's the kind of thing somebody's allowed to say. And there are contemporaneous records that would make that seem, you know, like the December 23 complaints of chest and back pain for two months at a 10 out of 10. So there's a contemporaneous record of that. You can't just say pain is conclusory. No, excruciating pain is. He was treated for pain, but there are 10 out of 10? But the pulmonologist who saw him at the time could have prescribed the strongest pain reliever, and he chose not to. Was that a good or a bad? I'm not sure that helps you. Well, but. You ignore people. You're saying that it's okay for CIRMAC when people say they're in excruciating pain just to stick with the Tylenol. But, Your Honor, the. Yes, you are saying that. So I guess. No, I'm not saying that, Your Honor. What I'm saying is that there's an allegation, a conclusory allegation that he was in excruciating pain, but what the facts underlie suggest is that, in fact, it was pain that could be treated with aspirin. No, they don't. Or Tylenol. How can you say that when we're supposed to construe the allegations of the complaint in the light most favorable to the party who's defending the 12B6 motion? But, Your Honor, in this case, given that we have more facts, asking you to draw an inference that the record suggests isn't true isn't reasonable. The record does not suggest that it isn't true. When you've got a gigantic metastatic lung tumor that's impinging on your spinal cord, what's implausible about the idea that you might be in pain? The question is whether or not Dr. What's implausible about that? Nothing. He was certainly in pain, and we can see that he was in pain, Your Honor, but Dr. Bonaparte could have prescribed narcotic-strength pain relievers if she subjectively believed that Tylenol was inadequate. If she was in an infirmary setting, it's the same thing. I mean, it's a prescription for him. She also knew, according to the amended complaint and the evidence developed for the summary judgment record, that he was having a CT scan that very day, or had had a CT scan even before she examined him, and the results were pending, and it's plausible, or at least it could be plausibly argued that it's deliberately indifferent not to keep him in the infirmary until those results are back to see what's going on. Well, I don't know that it was actually... That would be done in any emergency room. You don't discharge the patient while you're awaiting the results of a test that was just performed. Yes, Your Honor, but I don't know that it was actually alleged that she was aware of those two CT scans that were taken. It is. Paragraph 40. Okay. But, Your Honor, that's not deliberate indifference. That's negligence, that she should have. Yes, she should have looked at the CT scans, and she didn't, but she still, based on her interview of the patient on January 2nd, she was led to believe that, in fact, he wasn't in severe pain and that he could walk. I mean, they keep arguing that he was paralyzed on January 2nd. She gave him a walker, which suggests that he could walk, and that, Your Honor, one thing I want to clarify, he wasn't sent to Division 10 for a psych consult. The psych consult was done between December 30th and December 31st. She noted on the record that a psych consult had been done, and it didn't rule out malingering. That was the point of that. He was sent to Division 10... I just can't believe this. With the film's objective evidence of this tumor that people are talking about malingering, I feel like I'm in an alternative world. But, as Dr. Stern... Do you like malingering the lung tumor? No, Your Honor... Do you like Malter, the films? Your Honor, not the lung tumor. We didn't... We're not suggesting the lung tumor wasn't a true subjective, objective condition. It was his claim that he couldn't walk. He was observed walking in the infirmary. He was observed lifting his legs to take off his socks. That was the reason that gave rise to asking the mental health specialist... Isn't that just a sidelight, though? I mean, the problem here is that he's in tremendous pain from this gigantic lung tumor, and it doesn't get treated until after he's sent back to the hospital, back to Stroger, on the 5th. Well, treatment... I mean, obviously, Dr. Bonaparte couldn't treat the mass, Your Honor. It was... CIRMEC is just an urgent care facility. There's no... Right. She could have kept him and given him pain relief. But he was getting... You just said, yeah, that she could have given him more powerful pain relief than Tylenol. I mean, she's treating suspected metastatic cancer as though it were a headache. Well, at that time, Your Honor, there had been no biopsy done, so... Right, but the films are suggestive of metastatic cancer. Well, they're suggestive of a mass. I mean, the biopsy established the cancer when he was at Stroger. Right. I mean, he's being seen by a pulmonologist on that working diagnosis, right? Yes, Your Honor. And these follow-ups are being ordered. So I think you're still pushing the facts in your light, which, of course, you're entitled to do at a trial, but I think taking them from the other perspective, which is what we have to do right now, it's a much tougher road for you to go down with respect to Dr. Bonaparte. Can I turn to the Monell claim? Certainly. Judge Durkin was clearly correct in deciding that the plaintiff failed to show that policies at CERMAC were the moving cause of Mr. Dixon's injuries. I think the main policy, and you can correct me if I'm wrong, that they're focusing on is the failure to have a system that gets information, complete information to the doctors in a timely way. This sort of maybe it was just a transitional stage. I don't want to be too judgmental about it, but some stuff is in the electronic records, some stuff is in paper records, maybe the electronic records aren't up to date, and doctors who don't have the full file in front of them are automatically impaired from doing the right thing. The only documents that Dr. Bonaparte didn't have available, that wasn't in the Cerner system, were the three progress notes of Mr. Dixon's encounters with two doctors and a PA when he was in Division 9. You haven't said that, though. As you've been standing here, you've been saying maybe she didn't see this or maybe she didn't see that, chest X-rays. It's not clear what she knew. She knew of the mass, Your Honor. It's unquestionable that she knew of the mass. It's on everything that she put down that she was aware that the mass was present. And so Plancy is suggesting that either she knows everything about the guy or she knows nothing. Clearly she knew about the mass, and she knew that he was under the care of a pulmonologist. Did she know? I mean, why does she order the urgent pulmonary consult when it's already been ordered? Because she didn't find that in the record was what she testified to. Well, there you go. But it doesn't mean it wasn't there, Your Honor. It's just she couldn't find it. And so to make sure that he was going to go see a pulmonologist, she ordered the pulmonary consult. A jury might think it means that she didn't have that information available to her at this policy level, that it's just such a bad system, that the doctors are operating in a blind manner. But importantly, Your Honor, plaintiff still doesn't have causation.  But they don't show that that problem caused the error. What they want you to do is just assume it happened. They have a line that Judge Durkin cleaved from the causation, the fact that these problems existed. What Monell requires is not just that it's possible that the practice or policy caused the injury, but in fact was the moving cause. And could a jury find that based on this record is the way I want to refuse that. No, Your Honor. First of all. I think, you know, she at least, you know, would want to say, if I'd had all the information in front of me, of course, I would have sent him straight over to Stroger for the correct treatment. We would have followed up with the pulmonologist sooner. We would have done the things that were necessary to give him the palliative care that he needed. But they didn't provide that evidence. Dr. Greifinger's testimony was excluded by both Judge Leinweber and Judge Durkin? Not as much as you said it was, though. They just, I thought that was a more targeted ruling. It was, Your Honor, because I asked for the wrong relief. But Judge Leinweber invited me to bring another motion to eliminate if we approach trial. He ruled on page 9 of his decision that, in fact, he found Greifinger's report to be both unreliable and irrelevant because he simply provides bottom-line conclusions. Well, but I don't know that that's true. I think, you know, initially he just says the bottom-line conclusions are excluded, but the rest of the report stays. So you just sort of strike the... Right, but what was left of the report then, if you struck his conclusions, which were conclusory, was simply the facts alleged in the complaint or his narration of facts that occurred. And so that's what you have to do on summary judgment. You can't just rest on your complaint. You've got to get testimony. Right, but what I'm saying is there is no expert opinion from Dr. Greifinger that would be admissible where he establishes that county policies were the cause of the injury, were the moving force behind the injury. I think that might depend on how you read it. Well, it's page 9 of Judge Leinweber's decision. I know, and we are reviewing Judge Leinweber's decision, so I'm very glad Judge Leinweber told us what he's thinking. That's important. Your Honor, if there's no more questions, I ask you to affirm the decision to the district court in this case. All right. Thank you. Well, thank you. Anything further, Mr. Robertson? I just briefly wanted to correct something I said to Judge Sykes on the nurse issue. It is the guard that did put him on the sick call three days later. I initially thought it was the nurse. The key point is the nurse did not see him and had forced the guards to take that action, and they wound up calling back in. So it wasn't the nurse that put him on three days later, and I apologize for that. It was the guard. But it doesn't lessen our point that the denial of care at that point in time establishes deliberate indifference. Is it clear from the complaint that the onus is on the nurse to summon the inmate to the health care unit? The argument that I made was that it's reasonably inferrable that if he's the one that's supposed to be called and he's the one that's supposed to deal with that, that that's the person in charge, by the fact that that's the person called. And, you know, we're dealing with so many different people across so many, you know, that's the position that they're in. I would briefly touch on the Monell causation. Well, or I won't. You have a minute. Oh, thank you. Just briefly on the Monell causation. Causation usually have to be proved circumstantially. And here we have, we've identified the problem, longstanding problem with the DOJ report. We have Dr. Greifinger saying that the same problems exist, and we also have supported that with Dr. Hart's testimony, their chief medical officer, as well as one of the other physicians there, Dr. Cruz. All of this show that there's a genuine issue of material fact as to whether the county has a policy which impedes informed decision-making through their failure to give timely medical care, their dysfunctional record-keeping, and their ability to render proper palliative care that resulted in Mr. Dixon's increased pain. And policy liability on the part of the county would not be inconsistent with Dr. Bonaparte's liability? You know, may I have time to answer your question? Certainly, of course. I'm sorry. There's a certain tension between the two claims, but I think that when the defendants kind of tried to grab for both, you know, I think if Dr. Bonaparte would have come in and said, you know, I had no idea the record-keeping system we got, it's terrible. You know, that might have gotten her out. We'd still have the inferences, but she didn't say that. She was like, I knew of the math. And then she tries to kind of, you know, glom on and play team player after she's out, like, oh, yeah, everything's great with the record-keeping system. I think in light of this, we should be able to present both to the jury and that they should be able to argue, hey, it's not the doctor or it's not the policy, and we should be able to argue it's both or you pick. Because in this case, the responsibility lies somewhere. It should be for a jury to find out who. Thank you so much, Your Honor. All right, thank you. Thanks to both counsel. We'll take the case under advisement.